# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (BALTIMORE)

| | |
|---|---|
| JASON LAUGHERTY<br>12208 Woodiron Drive<br>Duluth, GA 30097<br>Individually and on behalf of all others<br>similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ATLANTIC COAST FINANCIAL<br>CORPORATION,<br>505 Haines Avenue<br>Waycross, GA 31501<br><br>SERVE ON:<br>CSC-Lawyers Incorporating Service Company<br>7 St. Paul Street, Suite 1660<br>Baltimore, MD 21202<br><br>ATLANTIC COAST BANK<br>c/o Atlantic Coast Financial Corporation<br>505 Haines Avenue<br>Waycross, GA 31501<br><br>SERVE ON:<br>CSC-Lawyers Incorporating Service Company<br>7 St. Paul Street, Suite 1660<br>Baltimore, MD 21202<br><br>BOND STREET HOLDINGS, INC.<br>5301 Blue Lagoon Drive<br>Suite 200<br>Miami, FL 33126<br><br>SERVE ON:<br>NRAI Services, Inc.<br>515 E. Park Avenue<br>Tallahassee, FL 32301 | Civil Action No. _____<br><br><br>**PLAINTIFF'S COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

FLORIDA COMMUNITY BANK, N.A.     §
c/o Bond Street Holdings, Inc.     §
5301 Blue Lagoon Drive     §
Suite 200     §
Miami, FL 33126     §
     §
SERVE ON:     §
NRAI Services, Inc.     §
515 E. Park Avenue     §
Tallahassee, FL 32301     §
     §
FORREST W. SWEAT JR.     §
c/o Atlantic Coast Financial Corporation     §
505 Haines Avenue     §
Waycross, GA 31501     §
     §
SERVE ON:     §
CSC-Lawyers Incorporating Service Company     §
7 St. Paul Street, Suite 1660     §
Baltimore, MD 21202     §
     §
CHARLES E. MARTIN JR.     §
c/o Atlantic Coast Financial Corporation     §
505 Haines Avenue     §
Waycross, GA 31501     §
     §
SERVE ON:     §
CSC-Lawyers Incorporating Service Company     §
7 St. Paul Street, Suite 1660     §
Baltimore, MD 21202     §
     §
THOMAS F. BEECKLER     §
c/o Atlantic Coast Financial Corporation     §
505 Haines Avenue     §
Waycross, GA 31501     §
     §
SERVE ON:     §
CSC-Lawyers Incorporating Service Company     §
7 St. Paul Street, Suite 1660     §
Baltimore, MD 21202     §
     §
G. THOMAS FRANKLAND     §
c/o Atlantic Coast Financial Corporation     §
505 Haines Avenue     §
Waycross, GA 31501     §

SERVE ON:                                              §
CSC-Lawyers Incorporating Service Company              §
7 St. Paul Street, Suite 1660                          §
Baltimore, MD 21202                                    §
                                                       §
JOHN J. LINFANTE                                        §
c/o Atlantic Coast Financial Corporation               §
505 Haines Avenue                                      §
Waycross, GA 31501                                     §
                                                       §
SERVE ON:                                              §
CSC-Lawyers Incorporating Service Company              §
7 St. Paul Street, Suite 1660                          §
Baltimore, MD 21202                                    §
                                                       §
W. ERIC PALMER                                          §
c/o Atlantic Coast Financial Corporation               §
505 Haines Avenue                                      §
Waycross, GA 31501                                     §
                                                       §
SERVE ON:                                              §
CSC-Lawyers Incorporating Service Company              §
7 St. Paul Street, Suite 1660                          §
Baltimore, MD 21202                                    §
                                                       §
H. DENNIS WOODS                                         §
c/o Atlantic Coast Financial Corporation               §
505 Haines Avenue                                      §
Waycross, GA 31501                                     §
                                                       §
SERVE ON:                                              §
CSC-Lawyers Incorporating Service Company              §
7 St. Paul Street, Suite 1660                          §
Baltimore, MD 21202                                    §
                                                       §
                   Defendants.                         §
                                                       §
                                                       §
                                                       §
                                                       §
                                                       §
                                                       §
                                                       §
                                                       §

Plaintiff, Jason Laugherty ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to it, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this shareholder class action on behalf of Atlantic Coast Financial Corporation, and on behalf of himself and all other public shareholders of Atlantic Coast Financial Corporation and its savings bank subsidiary, Atlantic Coast Bank (collectively "Atlantic" or the "Company"), against Atlantic, its Board of Directors (the "Board" or the "Individual Defendants"), Bond Street Holdings, Inc. ("Bond"), and Florida Community Bank, N.A. ("Florida Community Bank") (collectively, the "Defendants"), for their breaches of fiduciary duties arising out of the proposed transaction in which Bond will acquire each share of Atlantic's common stock for $5.00 per share (the "Proposed Acquisition" or the "Merger").   Additionally, Plaintiff, individually, brings a claim against the Individual Defendants for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      At the time of the initial announcement of the Proposed Acquisition, $2.00 per share (of the $5.00 per share deal price) was to be held in an escrow account and to cover losses from stockholder claims for one year following the closing of the Merger or until the final resolution of such claims, if later.  Defendants abandoned this course of action after the filing of Plaintiff's state court pleadings.  A vote is presently scheduled on this deal on June 11, 2013.

3.      In direct contrast to the significant evidence of the Company's ability to continue to execute on its strategic plan, grow revenue and trim its economic losses over the past year, the Proposed Acquisition is the product of a hopelessly flawed process designed to ensure the sale of Atlantic to Bond

on terms preferential to Defendants and to subvert the interests of Plaintiff and the other public stockholders of the Company.

4.     Analyst expectations, financial performance and historical trading prices all establish that the consideration to be received by Atlantic shareholders in the Proposed Acquisition is unfair and inadequate.  Significantly, when the deal was announced, of the $5.00 per share "purchase price," only $3 was guaranteed to Atlantic shareholders as $2.00 was to be held in an escrow account and available to cover losses from stockholder claims for one year or until the final resolution of such claims, if later. In fact, Atlantic was trading well above $3.00 per share ($3.55 per share) on February 25, 2013, one day prior to the Merger announcement, as high as $3.71 per share on January 25, 2013 and as high as $10.32 per share as recently as March11, 2011.  Moreover, at least one Yahoo! Finance analyst has set a $4.00 per share target price for the Company *while Atlantic's reported book value per share for the instant quarter is an impressive $16.96 per share, more than 3x the "purchase price."*

5.     Thus, the consideration offered initially offered in the Proposed Acquisition was an illusory "premium" and/or no premium at all.  Pursuant to the Merger Agreement, $2 was being held back to provide indemnity for Atlantic stockholder claims – claims that the Company knew or should have reasonably known were likely, particularly given the low price being offered when compared with the $16.96 book value per share and the $10.00 per share paid by many current Atlantic stockholders in the 2010 offering.  Moreover, this $2 "holdback" was not related to any earnout or similar situation where there is risk-sharing between buyer and seller.  Under these circumstances, using anything but the $3 guaranteed payment to assess the fairness of the consideration was inappropriate, and at the time the Merger Agreement was approved by the Board, the $3 guaranteed payment actually represented over a 10% *discount* to the 10-day average trading price of $3.36 cited in the Company's press releases.

6.     The $2.00 holdback for stockholder claims was highly unusual in a public company M&A transaction generally and particularly inappropriate under the current circumstances, where Atlantic stockholders have no right to seek judicial appraisal of the value of their Atlantic shares if they are dissatisfied with the price being offered. Under Maryland law (the law under which Atlantic is incorporated), appraisal rights are generally not available to stockholders of companies whose shares of stock trade on a national exchange.   Thus, in the absence of appraisal rights, objecting Atlantic stockholders have only one avenue of redress – to file suit against the Company. The $2.00 holdback, however, was specifically designed to deter a lawsuit and create  the exact and highly prejudicial dilemma sought by Defendants - a shareholder claim may adversely impact the consideration ultimately received.  The clear intent of this provision was to coerce Atlantic shareholders into accepting Bond's terms without complaint.

7.     On April 22, 2013, after Plaintiff had raised issues in his initial and amended state court complaints with respect to the coercive nature of the $2.00 escrow amount, the Atlantic Board met and altered its position on the escrow payment.  In the 8-K issued to announce the revised deal price, defendant Frankland stated "[i]t simplifies the transaction's structure for stockholders and at the same time addresses the concerns about the transaction raised by certain dissenting stockholders."

8.     However, even the $5.00 transaction is an inadequate price for the Company's shares. *Indeed, nearly 25% of the Company's Board openly disagree with the Company's decision to enter into the agreed upon Merger with Bond.*  Significantly, on March 26, 2013, board members Jay Sidhu ("Sidhu") and Bhanu Choudhrie ("Choudhrie") delivered a letter to the Board of Directors in which they state that they intend to vote the shares of Atlantic owned by them against the Merger when it is brought to a stockholder vote (the "Letter").  In the Letter, Sidhu and Choudhrie describe their concerns

3

regarding the Merger, the fairness of the consideration being offered to the Atlantic's stockholders and the process undertaken by the Board of Directors in considering and approving the Merger and Merger Agreement.

9.      In addition and pursuant to the Letter, Sidhu and Choudhrie expressed their belief that a recapitalized Atlantic would provide better value to the Company's stockholders than the Merger and that the changes in the Board of Directors and implementation of other initiatives that have been proposed over the past year would provide the Company's stockholders with much better options in the future, either through a sale on better terms than the Merger or by operating Atlantic as an independent public company.

10.     Moreover, on April 24, 2013, Sidhu and Choudrie further stated their opposition to the merger valuation in a letter to the Board of Directors, stating, in part:

> Even a $5 per share purchase price without a $2 holdback greatly undervalues ACFC.  It represents only about one-third of the company's tangible book value per share, which is well below the pricing of similar transactions in the company's peer group.  It does not adequately take into account the expected improved earnings resulting from the company's improving performance, especially its improving credit quality and the fact that the company is only a few quarters away from the negative carry of structured borrowings starting to abate.  And we continue to believe that the price is well below the value we think would result from implementing the recapitalization plan and other recommendations we have proposed and provided to you.

11.     Additionally, on May 13, 2013, Atlantic filed a Definitive Proxy Statement with the SEC (the "Definitive Proxy").   The Definitive Proxy contains numerous material misstatements and omissions.  As explained below, the Definitive Proxy exposes some details of the highly conflicted sales process, but fails to disclose material facts concerning the Proposed Acquisition – preventing shareholders from casting an informed vote for or against the Proposed Acquisition.  For example, the Definitive Proxy omits and/or misrepresents material information concerning, among other things: (a)

the sales process for Atlantic; (b) Atlantic's financial projections; and (c) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinion" provided by Stifel, Nicolaus & Company, Incorporated, an affiliate of Keefe, Bruyette & Woods ("KBW"), its financial advisor.   Moreover, review of the Proxy further establishes that the price offered to Atlantic shareholders is woefully inadequate and cannot be supported by a properly prepared valuation of the Company.

12.     In approving the Proposed Acquisition, however, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell to Bond without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Acquisition to benefit themselves and/or without regard for Atlantic's public shareholders. Moreover, as alleged further herein, Bond aided and abetted the Individual Defendants' breaches of fiduciary duty.   Accordingly, this action seeks to enjoin the shareholder vote on the Proposed Acquisition and compel the Individual Defendants to properly exercise their fiduciary duties to Atlantic's shareholders.

## PARTIES

13.     Plaintiff has been a shareholder of Atlantic Coast Financial Corporation at all times relevant hereto has been, and continues to be a shareholder of Atlantic Coast Financial Corporation.

14.     Defendant Forrest W. Sweat Jr. ("Sweat") is and has been the Vice Chairman of the Atlantic Board at all times relevant hereto.   Sweat is a partner in the law firm of Walker & Sweat, Waycross, Georgia.   According to the Company's Proxy statement, Sweat is the beneficial owner of 24,149 shares of Atlantic stock including 4,673 stock options.

15. Defendant G. Thomas Frankland ("Frankland") was appointed to the Board of Directors in August 2010 and was named Interim President and Chief Executive Officer of Atlantic in October 2010 and assumed the permanent role of President and Chief Executive Officer in May 2011. According to the Company's Proxy statement, Frankland is the beneficial owner of 18,454 shares of Atlantic stock, including 5,000 stock options.

16. Defendant John J. Linfante ("Linfante") has served as Chairman of the Atlantic Board at all times relevant hereto.

17. Defendant H. Dennis Woods ("Woods") has been a member of the Atlantic Board at all times relevant hereto. Woods is a retired employee of CSX Transportation, Inc., Waycross, Georgia, where he worked from 1964 until 2005 with Charles E. Martin Jr. ("Martin"). According to the Company's Proxy statement, Woods is the beneficial owner of 11,530 shares of Atlantic stock including 4,673 stock options.

18. Defendant Martin has served as a director of Atlantic and its predecessor, Atlantic Coast Federal Credit Union, since 1982. Martin is a retired employee of CSX Transportation, Inc. where he worked with Woods. Martin was a long-time resident of Waycross, Georgia. According to the Company's Proxy statement, Martin is the beneficial owner of 17,786 shares of Atlantic stock including 4,673 stock options.

19. Defendant Thomas F. Beeckler ("Beeckler") has served as a Director of Atlantic at all times relevant hereto. According to the Company's Proxy statement, Beeckler is the beneficial owner of 18,638 shares of Atlantic stock including 4,673 stock options.

20. Defendant W. Eric Palmer ("Palmer") has served as a Director of the Company at all times relevant hereto. Palmer was associated with Atlantic Coast Federal Credit Union as a member of

its Credit Union Service Organization and its Community Advisory Board. According to the Company's Proxy statement, Palmer is the beneficial owner of 8,762 shares of Atlantic stock including 4,673 stock options.

21.     Defendant Atlantic Coast Financial Corporation operates as the bank holding company for Atlantic Coast Bank that provides various banking services to individual and business customers primarily in northeastern Florida and southeastern Georgia. Atlantic Coast Financial Corporation was founded in 1939 and is based in Jacksonville, Florida and is incorporated in the state of Maryland. Atlantic Coast Financial Corporation's stock is traded on the Nasdaq under the symbol "ACFC."

22.     Defendant Atlantic Coast Bank is a savings subsidiary of Atlantic.

23.     Defendant Bond, Florida's fifth largest independent bank, was formed in 2009 and is headquartered in South Florida. On February 21, 2013, the Federal Reserve Bank of Atlanta (the "Federal Reserve") approved Bond's request to execute an agreement with the Company to acquire more than 10% of the Company's common stock.

24.     Defendant Florida Community Bank is a bank subsidiary of Bond.

25.     Defendants named in paragraphs 12-18 are referred to herein as "Individual Defendants" or "Director Defendants."

26.     By reason of their positions as officers and/or directors of the Company, the Individual Defendants named above are in a fiduciary relationship with Plaintiff and the other public shareholders of Atlantic and owe them a duty of candor and a duty to maximize shareholder value, as set forth in further detail herein.

27.     Jay Sidhu was named Executive Chairman of Atlantic in September 2010 and assumed the role of non-executive Chairman of the Company's Board in May 2011. Sidhu resigned from his

7

position as non-executive Chairman effective April 30, 3012, citing concerns that the board was failing to act to mitigate risks.  Sidhu signed a three-year consulting agreement with Atlantic Coast Financial in 2011 that is still active. According to the agreement, he provides advice on operating, personnel, business and tax planning strategies in addition to assistance on future capital-raising initiatives. He will receive $250,000 over the term of the agreement and is entitled to an incentive bonus of $500,000 if he helps the bank reach certain goals.  According to the Company's April 11, 2012, Schedule 14A that was filed with the SEC, Sidhu is the beneficial owner of 57,072 shares of Atlantic stock, including 3,920 stock options, which together represent 2.1% of all outstanding Company shares.  Sidhu voted against the Proposed Acquisition.

28.    Bhanu Choudhrie has been a member of the Atlantic Board at all times relevant hereto. According to the Company's Proxy statement, Choudhrie is the beneficial owner of 120,000 shares of Atlantic stock that equal 4.4% of all outstanding shares of Atlantic stock.  Choudhrie voted against the Proposed Acquisition.

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

30.    Venue is proper because Defendants reside, are found, have agents, and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

31.    This Court has personal jurisdiction over the Defendants because they are located in, transacted business in, or had substantial contacts with this District.

## SUBSTANTIVE ALLEGATIONS

32.     On February 26, 2013, Atlantic issued a press release and filed it with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the entry by Atlantic and Bond into a definitive agreement under which Bond will acquire Atlantic in a cash transaction (the "Merger Agreement").  The joint press release provides, in relevant part, as follows:

> JACKSONVILLE, Fla.--(BUSINESS WIRE)--February 26, 2013--Atlantic Coast Financial Corporation (the "Company") (NASDAQ: ACFC), the holding company for Atlantic Coast Bank (the "Bank"), today announced a strategic transaction that will achieve immediate enhanced value for all stockholders with respect to the present value of their investment, as well as a financially strong banking platform, and a competitive community banking organization that is well positioned to meet the needs of its customers and communities for the long term.
>
> Specifically, the Company has entered into a definitive merger agreement with Bond Street Holdings, Inc. ("Bond Street") under which the Company will merge into Bond Street, a community-oriented bank holding company with $3.2 billion in total assets that operates 41 community banking branches along both Florida coasts and in the Orlando area. Upon completion of that transaction, Atlantic Coast Bank will merge into Florida Community Bank, N.A., Bond Street's banking subsidiary.
>
> As a result of this strategic merger agreement, the Company's stockholders will receive $5.00 per share in cash for each common share owned. The $5.00 per share merger consideration to be realized by the Company's stockholders represents a premium of approximately 49% to the Company's average stock price of $3.36 over the 10-day period ended February 25, 2013. Of the total transaction price of $5.00, $2.00 will be held in an escrow account and will be available to cover losses from stockholder claims for one year or until the final resolution of such claims, if later. The transaction is expected to be completed by the end of the second quarter of 2013, subject to customary conditions, including regulatory approvals and the approval of Company stockholders.
>
> G. Thomas Frankland, President and Chief Executive Officer of the Company, said, "This transaction is a win for our stockholders, a win for our customers and a win for our banking franchise. This strategic business combination significantly enhances our combined abilities to be one of the financially strongest and most competitive community banking organizations in the northeast Florida and southeast Georgia markets. This transaction is an important and meaningful opportunity for our stockholders, our customers and our communities. The keys to community banking going forward are the resources that an organization can dedicate to build its customer market potential, the

9

soundness of the capital and operating capabilities of its platform, and its expertise about its markets and products to meet the financial services needs of its customers. We are confident that this merger is a highly attractive strategic alignment. Its completion will fulfill as well the capital mandate we have received from our regulators."

The Company stated that its Board of Directors and the Strategic Alternatives Committee of the Board, with the assistance of the Committee's independent financial advisor, Stifel, Nicolaus & Company, Incorporated, an affiliate of Keefe, Bruyette & Woods, Inc., (a Stifel Financial Corp Company), have considered various strategic alternatives for more than a year, including a recapitalization in the form of a rights offering as well as an outright merger transaction. In evaluating its options, the Committee and the Board considered the relative risks involved with the alternatives, along with the Company's goal of maximizing the return to stockholders. These risks include the prospects of approval by regulators for successful completion of other alternatives, the effectiveness of each option in gaining full compliance with the Consent Order issued by the Office of the Comptroller of the Currency under which the Bank currently operates, the Bank's continued exposure to credit, market, economic, and interest rate risks, as well as ongoing earnings pressure from the Company's asset quality and wholesale debt. Considering all these factors, the Board of Directors voted to proceed with the merger alternative, determining that it will provide stockholders with an enhanced return given market and business conditions, remove the prospects of future dilution to stockholders, and eliminate the operational and regulatory risks associated with a recapitalization.

"We are excited by the prospects of growing our bank platform with the addition of Atlantic Coast Bank and the opportunities we foresee as we move together to expand in the Jacksonville area as well as the Southeast Georgia markets," added Kent Ellert, President and Chief Executive Officer of Florida Community Bank. "This acquisition will enhance our Florida footprint significantly by giving us attractive visibility in the state's fourth largest metro area and will provide a substantial foundation for us to build a commercial lending team to spur future growth – precisely as we have done with the eight successful acquisitions we have previously completed. We look forward to having Atlantic Coast Bank on our team, building on its tradition and many great qualities, and together creating an even stronger community bank for customers."

When the transaction is completed, Florida Community Bank will become the fourth largest bank headquartered in Florida, with almost $4 billion in assets and 53 locations along both Florida coasts and in Southeast Georgia.

33.    Analyst expectations, financial performance and historical trading prices all establish that

the consideration to be received by Atlantic shareholders in the Proposed Acquisition is unfair and

inadequate.  Significantly, at the time of the announcement of the deal, of the $5.00 per share "purchase

10

price," only $3.00 was guaranteed to Atlantic shareholders as $2.00 was being held in an escrow account to cover losses from stockholder claims for one year or until the final resolution of such claims, if later. In fact, Atlantic was trading above $3.00 per share ($3.55 per share) on February 25, 2013, one day prior to the Merger announcement, as high as $3.71 per share on January 25, 2013 and as high as $10.32 per share as recently as March11, 2011.  Moreover, at least one Yahoo! Finance analyst has set a $4.00 per share target price for the Company while Atlantic's reported book value per share for the instant quarter is a whopping $16.96 per share, more than 3x the "purchase price."

34.     Thus, the consideration offered in the Proposed Acquisition represented an illusory "premium" and/or no premium at all.  Pursuant to the Merger Agreement, the $2.00 initial holdback was to provide indemnity for Atlantic stockholder claims – claims that the Company knew or should have reasonably known were likely, particularly given the low price being offered when compared with the $16.96 book value per share and the $10.00 per share paid by many current Atlantic stockholders in the 2010 offering.  Moreover, the $2.00 "holdback" was not related to any earnout or similar situation where there is risk-sharing between buyer and seller.  Under these circumstances, at the time of the initial filing of this action and amendment in state court, anything but the $3.00 guaranteed payment to assess the fairness of the consideration was inappropriate, and at the time the Merger Agreement was approved by the Board, the $3.00 guaranteed payment actually represented over a 10% *discount* to the 10-day average trading price of $3.36 cited in the company's press releases.

35.     Moreover, given the reliance by Atlantic in the Definitive Proxy on the Discounted Cash Flow ("DCF") Analysis to assess the fairness of the Merger consideration and the failure to disclose any projections at all, the failure to provide any information regarding how KBW accounts, if at all, for the approximately $45 million of Net Operating Losses ("NOL") illustrates the inadequacy of the $5.00

price.  Indeed, nearly 25% of the Company's Board continues to openly disagree with the Company's decision to enter into the agreed upon Merger with Bond and has voiced an opinion shared by Plaintiff and the other disgruntled Atlantic shareholders in the Leter that $5 per share is, simply, not enough.

36.     The $2.00 holdback for stockholder claims was highly unusual in a public company M&A transaction generally and particularly inappropriate under the current circumstances, where Atlantic stockholders have no right to seek judicial appraisal of the value of their Atlantic shares if they are dissatisfied with the price being offered.  Under Maryland law (the law under which Atlantic is incorporated), appraisal rights are generally not available to stockholders of companies whose shares of stock trade on a national exchange.   Thus, in the absence of appraisal rights, objecting Atlantic stockholders have only one avenue of redress – to file suit against the Company.  The $2.00 holdback, however, was specifically designed to deter a lawsuit and create the exact and highly prejudicial dilemma sought by Defendants - a shareholder claim may adversely impact the consideration ultimately received.  The clear intent of the provision was to coerce Atlantic shareholders into accepting Bond's terms without complaint.

37.     However, Plaintiff was not deterred and challenged the transaction.  In response, on April 22, 2013, after Plaintiff had raised issues in his initial and amended complaints with respect to coercive nature of the $2.00 escrow amount, the Atlantic Board met and altered its position on the escrow payment.   In the 8-K issued to announce the revised deal price, defendant Frankland stated ***"[i]t simplifies the transaction's structure for stockholders and at the same time addresses the concerns about the transaction raised by certain dissenting stockholders."*** (emphasis added).

38.     That same day, the Company issued the following press release:

JACKSONVILLE, Fla.--(BUSINESS WIRE)--April 23, 2013--Atlantic Coast Financial Corporation (the "Company") (NASDAQ: ACFC), the holding company for Atlantic

Coast Bank (the "Bank"), today announced that the definitive merger agreement with Bond Street Holdings Inc.("Bond Street"), dated February 25, 2013, has been amended to eliminate the transaction's $2.00 per share contingency consideration. Accordingly, the Company's stockholders will receive upon closing of the transaction the entire $5.00 per share in cash for each share owned. The amended merger agreement was approved by the respective Boards of Directors of both the Company and Bond Street, a community-oriented bank holding company with $3.2 billion in total assets that operates 41 community banking branches along both Florida coasts and in the Orlando area.

The transaction is expected to close by the end of the second quarter of 2013, subject to customary closing conditions, including regulatory approvals and the approval of Company stockholders. Upon completion of the merger transaction, Atlantic Coast Bank will merge into Florida Community Bank, N.A., Bond Street's banking subsidiary.

Under the previously announced merger agreement, the Company's stockholders were to receive $5.00 per share in cash for each common share owned. Of that amount, $2.00 of the total per share consideration was to be held in an escrow account and available to cover losses from stockholder claims for one year or until the final resolution of such claims, if later. Under the terms of the amended agreement, that contingency has been lifted.

G. Thomas Frankland, President and Chief Executive Officer of the Company, said, "This amended merger agreement provides our stockholders with cash payment in full at the time the transaction closes, eliminating any and all uncertainty about the value stockholders will receive and the timing of that payment. It enables our stockholders to capitalize immediately upon closing on the compelling value the transaction provides relative to our stock's recent historical and present trading values and mitigate their investment's potential exposure given the regulatory environment in which the Company is now operating. Simply put, it provides a transaction for stockholders, our organization and customers with minimal execution risks compared with the other strategic alternatives that the Board considered. It simplifies the transaction's structure for stockholders and at the same time addresses the concerns about the transaction raised by certain dissenting stockholders. With the escrow requirement now eliminated in favor of a straightforward cash transaction, we are confident we are on track to finalize the transaction as planned, and we look forward to joining with Florida Community Bank to build an even stronger and more competitive community banking organization."

Kent Ellert, President and Chief Executive Officer of Florida Community Bank, said, "We have continued to carefully review all aspects of the proposed merger with Atlantic Coast Financial Corporation, and we have become confident that we do not need a contingency reserve for this transaction. The proposed transaction value of this merger transaction - $5.00 all cash per share payable in full at closing - is $13.1 million. As announced on February 26, 2013, the $5.00 per share merger consideration to be realized by stockholders represents a premium of approximately 49% to the Company's average stock price of $3.36 over the 10-day period ended February 25, 2013, and continues to be

13

a premium to the stock price since that date. The transaction, in our view, is win-win for all parties - the stockholders of Atlantic Coast Financial Corporation, the banking organizations of both Atlantic Coast Bank and Florida Community Bank, and the customers and communities we serve. We look forward to the transaction's successful completion."

As announced in February, upon completion of the transaction, Atlantic Coast Bank will merge into Florida Community Bank, making Florida Community Bank the fourth largest bank headquartered in Florida, with almost $4 billion in assets and 53 locations along both Florida coasts and in Southeast Georgia.

39.     Indeed, the Company has seen its financial performance improve, trimming its losses considerably in the year 2012.  For example, on May 1, 2012, Atlantic reported a net loss of $1.7 million or $0.69 per diluted share, down from a net loss of $3.4 million or $1.36 per diluted share in the year-earlier quarter and down on a linked-quarter basis from a net loss of $4.0 million or $1.61 for the three months ended December 31, 2011.  Commenting on the first quarter results, Frankland said,

We are encouraged by the Company's first quarter results, which reflected an improvement in credit quality and the impact of our initiatives to reduce non-interest expenses. This resulted in an ongoing reduction in net loss concurrent with a reduction in non-performing assets [..] we continue to be encouraged by the strength of our banking operations, as well as our mortgage warehouse lending and small business initiatives. Also, improved liquidity in the market for the sale of non-performing assets yielded positive results this quarter. Considering these mixed currents, our board and management team remain committed to our strategies of reducing operating expenses, aggressively improving credit quality and developing Atlantic Coast Bank's retail community banking model, which we believe will continue to improve our financial results in the future.

40.     In reporting Q2 2012 financial and operating results on August 30, 2012, Frankland was again optimistic in stating:

Following the improvements we cited in our first quarter report, we were pleased to see the Company continue to make headway in several key areas during the second quarter. Specifically, we witnessed further progress in reducing non-performing assets and lowering deposit costs. We also reduced non-interest expense compared with the year-earlier quarter and for the first half of the year versus the same period in 2011. Additionally, we are encouraged by the efforts of our retail banking team as it continues to show good progress in lower cost deposit production, as well as our warehouse and

small business lending teams as they continue to build loan income. Lastly, our operations team has been successful in pursuing cost initiatives that will further reduce our non-interest expense.

41.     The Company issued its Q3 2012 financial and operating results press release on October 6, 2012, wherein Frankland stated again that Atlantic was "pleased to report additional reductions in our non-performing asset levels – now over a third less than the amounts at the beginning of 2012. Our strategy to be opportunistic in dealing with problem loans has proven effective. Also, our warehouse lending had a strong quarter with the end-of-quarter balance increasing by 41% to $72 million from the second quarter-end amount, and our retail banking team performed well with their deposit retention and growth campaign. Like many banks, our net interest income is softening given the extended low interest rate environment."

42.     Then on March 4, 2013, the Company was again pleased to report that its net loss for the quarter of $0.3 million or $0.12 per diluted share was far improved compared to a net loss of $4.0 million or $1.61 per diluted share in the year-earlier quarter and a net loss of $1.7 million or $0.66 per diluted share in the third quarter of 2012.  For full year 2012, Atlantic's net loss totaled $6.7 million or $2.67 per diluted share compared with a net loss for 2011 of $10.3 million or $4.13 per diluted share. Business is clearly improving.

43.     Regardless of the Company being able to successfully trim net losses by approximately $3.6 million in 2012, there appears to be a serious disagreement over the direction and management of the Company amongst the Individual Defendants.  Directors Sidhu and Choudrie are "determined to see a positive change" made to the bank holding company, and view a change on the Board of Directors as the first step toward that end.  Sidhu and Choudrie voiced these concerns in a letter to the Board on February 20, 2013, wherein they stated, "To our amazement, the majority of the Board has consistently

failed to act to mitigate or significantly reduce the risks facing the corporation and follow prudent safety and sound banking practices, in spite of several plans put forward by some directors."  In the Letter, Sidhu notes that Chairman of the Board, defendant Linfante, refused to call a meeting to discuss matters relating to suggestions that included a cost reduction/productivity improvement plan; a structured and comprehensive risk assessment, mitigation plan and stress testing process; and a strategic and tactical profit improvement and turnaround plan.

44.      Moreover, in the Letter, Sidhu and Choudrie identified three individuals for nomination to the Board at the upcoming annual meeting.  In an interview with the Jacksonville Business Journal, Sidhu stated that a stronger board would lead to greater shareholder confidence and, further, "We want to have a very high quality board [.]  The board that we have now, they listen but they don't want to act. They don't want to rock the boat. We don't want to rock the boat either. We'd like to see the boat sailing successfully."

45.      Atlantic's Board has been unable to agree on the direction of the Company for quite some time, during which, prior Atlantic directors have resigned.  For example, in June 2012, ex-Atlantic Board member Charles Carey ("Carey") resigned from the board, citing as his reasons governance concerns, business planning and execution and teamwork concerns.  In a letter date June 2, 2012, Carey stated, "In the limited time I have served on the board it has become apparent to me that, given the events that have transpired, and current circumstances at ACFC, I will be unable to effectively serve as a board member […] Although other directors and I have made repeated requests over the last few months for a credible business plan, no such plan has been shared with us […]The Board's ability to effectively manage the business has been significantly thwarted by the polarization of Board members and the contentious nature of interactions among directors."

16

46.     One of the concerns raised in Carey's resignation letter related to stock purchases defendant Frankland made in December 2011.  Frankland acquired 7,046 additional shares of stock for an aggregate purchase price of $10,143.  In his letter to the Board, Carey stated that the Board failed to fully implement the recommendations of legal counsel relating to the stock purchases.  Sidhu said he agreed with Carey's opinion.  "The stock purchases were absolutely an inappropriate thing to do," Sidhu said. "He was privy to insider information and you just don't buy the stock."  Sidhu added about the Board, "They're just not focused on what it takes to turn a bank around.  They're not making the tough decisions."

47.     The in-fighting between Frankland and Sidhu is at an all time high.   Sidhu joined the Company as the Executive Chairman in 2010 and recruited Frankland to join as Interim President and CEO to help complete the conversion to a fully public company.  When the Board appointed Frankland to the top executive role permanently in May 2011, Sidhu's executive role was eliminated and he was named Chairman of the Board.  Current Board Chairman Linfante has called Sidhu a dissident board member and said he believes that one of the issues is that Sidhu lost control when his executive role was eliminated.  In a June 15, 2012, Jacksonville Business Journal article, *Execs squabble over how to save Atlantic Coast Financial*, Linfante said of Sidhu, "He wanted to dominate.  His operating style is one of bullying instead of agreeing by consensus."

48.     Sidhu called those claims silly and outrageous. "He [Linfante] is a 20-year friend of Tom Frankland and puts his personal and his friends' interests ahead of shareholders," Sidhu wrote in an email. "Bhanu Choudhrie and I are the largest shareholders on the board and we just want the bank to rebuild shareholder value destroyed by poor decisions of a majority of board members that have destroyed $60 million in shareholder value over the past five years."   Sidhu signed a three-year

consulting agreement with Atlantic Coast Financial in 2011 that is still active. According to the agreement, he provides advice on operating, personnel, business and tax planning strategies in addition to assistance on future capital-raising initiatives.   He will receive $250,000 over the term of the agreement and is entitled to an incentive bonus of $500,000 if he helps the bank reach certain goals.

49.     On February 21, 2013, the Federal Reserve approved Bond's request to execute an agreement with the Company to acquire more than 10% of the Company's common stock.  Bond's considerable Atlantic stock holdings, together with the share ownership of Atlantic's directors and executive officers (less those shares owned by defendants Sidhu and Choudhrie who do not intend to vote their shares in favor of the Merger) equal approximately 15% of all outstanding Atlantic shares that have already been committed in support of the Merger before a single common shareholder has had an opportunity to review the Merger Agreement.

50.     Significantly, Sidhu and Choudhrie voiced in the Letter to the Board that they intend to vote the shares of Atlantic owned by them against the Merger when it is brought to a stockholder vote. In the Letter, Sidhu and Choudhrie also describe their concerns regarding the Merger, the fairness of the consideration being offered to the Atlantic Coast Financial's stockholders, the process undertaken by the Board of Directors in considering and approving the Merger and Merger Agreement and related matters.

51.     In addition and pursuant to the Letter, Sidhu and Choudhrie express their belief that a recapitalized Atlantic would provide better value to the Company's stockholders than the Merger and that the changes in the Board of Directors and implementation of other initiatives that have been proposed over the past year would provide the Company's stockholders with much better options in the future, either through a sale on better terms than the Merger or by operating Atlantic as an independent

18

public company.   Sidhu and Choudhrie also stated that the Board has consistently failed to act to mitigate or significantly reduce the risks facing Atlantic and follow prudent safety and sound banking practices, in spite of several plans put forward by certain directors.  The Letter, reads in its entirety, is as follows:

March 26, 2013

ATLANTIC COAST FINANCIAL CORPORATION
10151 Deerwood Park Boulevard
Building 200, Suite 100
Jacksonville, Florida 32256

Attention:                      Board of Directors

Gentlemen:

We are writing to you to express our serious concerns regarding the proposed merger with Bond Street Holdings.  I am writing this letter on behalf of myself and my fellow director Bhanu Choudhrie. As you know, in addition to our service as directors of ACFC, we are also significant ACFC stockholders and are writing this letter to you in that capacity.  As of this date, we collectively own approximately 6.6% of ACFC's voting common stock (177,072 shares).  We do not believe that the terms agreed to by the ACFC Board of Directors, including the price being offered, are fair to or in the best interest of ACFC's stockholders. We also do not believe that the process the Board followed in considering and approving the merger was adequate. We believe that a recapitalized ACFC will provide much better value to ACFC's stockholders and that changes in Board membership and implementing other initiatives we and others have proposed over the past year will provide ACFC stockholders with much better options in the future, either through a sale on better terms than Bond Street is offering or as an independent public company.

As you know, we opposed the proposed Bond Street transaction in our capacity as directors. As stockholders, we also oppose the transaction and we intend to vote our ACFC shares against the proposal when it is brought to an ACFC stockholder vote. Below we provide additional detail regarding our key concerns with the Bond Street terms and the Board's process in approving the proposed Bond Street transaction. We urge you to reconsider the Bond Street transaction or seek a much higher and fair price, or fully consider and pursue our recapitalization proposal and move forward with calling and holding the 2013 Annual Meeting so that ACFC can elect new directors and create value for stockholders.

As an initial matter, we take issue with ACFC's public characterization that the price being offered by Bond Street represents any "premium" to ACFC's pre-announcement trading price and any enhanced value for ACFC stockholders. This is not a $5 per share deal. Only the $3 payment is guaranteed, so fully 40% of the consideration payable to ACFC stockholders is contingent consideration. And the contingency is not related to any earnout or similar situation where there is risk-sharing between buyer and seller may be understandable. Here, the additional $2 is being held back to provide indemnity for ACFC stockholder claims – claims that you knew or should have known were likely, particularly given the low price being offered when compared with the $16.96 book value per share and the $10.00 per share paid by many current ACFC stockholders in the 2010 offering. Under these circumstances, using anything but the $3 guaranteed payment to assess the fairness of the consideration is inappropriate, and at the time the merger agreement was approved by the Board, the $3 guaranteed payment actually represented over a 10% *discount* to the 10-day average trading price of $3.36 cited in the company's press releases.

 The $2 holdback for stockholder claims is of great concern to us, as we believe it is likely to have a coercive effect on ACFC stockholders. We believe that this is not a common term in public company M&A transactions generally and it seems to us to be particularly inappropriate under the current circumstances, where ACFC stockholders will have no right to dissent from the merger and seek judicial appraisal of the value of their ACFC shares if they are dissatisfied with the price being offered. In the absence of appraisal rights, objecting ACFC stockholders have only one avenue of redress – filing suit against the company. But a holdback like this that is specifically designed to apply if an ACFC stockholder sues creates an impossible dilemma for stockholders, because any claims they might bring could adversely impact the consideration they ultimately receive, as the costs, expenses and other "losses" incurred by ACFC or Bond Street are charged against the $2 holdback. In a worst-case scenario, stockholders would pay twice as a result of legitimately exercising their legal rights – first, for their own legal fees to bring an action against ACFC and, second, by indemnifying Bond Street through a reduction in the $2 per share holdback for ACFC's and Bond Street's costs, expenses and other "losses." The effect is that stockholders can be penalized for exercising their legal rights, and we believe the clear intent of this provision is to coerce them into accepting the Bond Street terms without complaint.

The Board's process in approving the $2 holdback is particularly troubling to us. This is an essential part of the transaction – as it makes fully 40% of the consideration payable to ACFC stockholders contingent – yet none of the material terms of the holdback were finalized at the time the Board approved the Merger. All of those terms are apparently going to be included in an escrow agreement at some point, but that agreement was not considered or approved by the Board when the Board approved the merger because that agreement did not yet exist. How could the Board be fully-informed as to the potential consequences of the holdback when it made its determination that the transaction was in

the best interests of ACFC's stockholders if the material terms of that holdback had not yet been negotiated and finalized? The only information considered by the Board consisted of a "Summary Terms of Escrow Agreement" that is attached to the merger agreement. Did the Board realize how the remarkably broad concept of "losses" described in that summary would be carried over to a definitive agreement?

We also believe that the Bond Street-favorable deal protection provisions effectively preclude other potential acquisition partners from submitting alternative proposals and could fundamentally hinder any possible recapitalization of ACFC. In particular, we are troubled by the $650,000 termination fee payable by ACFC to Bond Street in the event ACFC pursues any significant alternative transaction. This fee is equal to approximately 8.25% of the guaranteed $3 consideration payable to ACFC stockholders, which we believe is much higher than typical termination fees. In addition, we are concerned with the 25% "change of control" threshold that triggers the obligation to pay Bond Street, which could impact any capital-raising effort in the event ACFC stockholders choose not to approve the Bond Street merger and the company, by necessity, sells additional equity. In our opinion, the fairness opinion provided by Stifel is totally inadequate. You are aware that Bond Street's Chairman Dan Healy was also a board member of a company Stifel was acquiring. They should have resigned from this engagement due to an obvious appearance of conflict. The ACFC Board has, in essence, given an option to Bond Street for a very attractive acquisition of ACFC and even found a way to potentially pay Bond Street for this option through the inclusion of the break up fee.

We also believe that the company's assertions that the Board and the Strategic Alternatives Committee adequately considered alternative courses and, in particular, a recapitalization involving a rights offering do not satisfactorily represent the Board's and Committee's process. Rather than continue any dialogue regarding a recapitalization, the Board refused to give any real consideration to any alternative other than Bond Street and, in our view, hurriedly approved and signed the merger agreement after receiving our proposal regarding changes to the Board and our public statements regarding our recommended actions toward increasing stockholder value.

As we indicated in our prior letter to the Board, we believe ACFC can be made profitable over the next few quarters, credit can be expected to experience continued, gradual improvement, risks can be effectively managed, capital can be raised at market price, some or possibly all of the Deferred Tax Asset can be realized over a period of time and stockholder value can be created either thru a sale at a future date at a reasonable price or the company can continue to operate independently and grow in the Jacksonville area. We do not believe the Bond Street transaction, as announced, is in the best interests of ACFC stockholders and expect that stockholders will not approve the proposal. The lawsuit already filed regarding the transaction is indicative of stockholder dissatisfaction with the merger. We call upon the entire Board to take immediate action to consider other alternatives, including the recapitalization plan we have previously discussed with the Board, and avoid further delays and costs the company will incur for a transaction

21

that we believe will not be completed. Also, the Board should immediately move forward in calling the 2013 annual shareholder meeting of ACFC so the stockholders can elect new directors and move forward with intensity to create substantial value for all stockholders. We hope that you will recognize that we only want to achieve what is the best for ACFC and its stockholders.

Sincerely,

/s/ Jay S. Sidhu

Jay S. Sidhu

Cc:  Bhanu Choudhrie

52.     On March 27, 2013, Atlantic issued a tersely written one paragraph response to the Letter which failed to substantively address any of Sidhu and Choudhrie's concerns regarding,  (i)  the process by which the Merger was entered into, (ii) the consideration payable to Atlantic shareholders and the attendant $2 holdback, (iii) the lack of appraisal rights for Atlantic shareholders, (iv)  the size of the termination fee, and/or (v) any potential conflicts of interest that may be present other than to reiterate that, in the opinion of the Board, approving the Merger is in the best interests of the Company's shareholders.

53.     Support for the Proposed Acquisition on the Nasdaq, where ACFC is publicly traded, is low.  When the "$5" per share buyout was announced, Atlantic's stock was trading at $3.54.  Shortly after the Merger announcement, ACFC shares spiked to as high as $4.88 per share.  However, since the terms of the deal, and in particular the $2 per share holdback, came into focus, the price of Atlantic's stock tumbled to $4.42 per share as of April 1, 2013.  Stated Neal Greenberg of *Seeking Alpha*, "It seems to me that any price currently above $3.50-$3.75 for ACFC common stock seems like a gamble, as what part of that $2 to be returned to you, after at least one year, remains very unsure."

54.     Indeed, the $2.00 "holdback," and the explanations therefore, were vague and ever changing.  According to the Definitive Proxy, a $2.00 holdback, in some form, had been discussed as far back as June 2012.  At that time, the $2.00 was discussed as a contingent value right ("CVR") based on "future asset quality performance during a five year period."  Definitive Proxy at 22.  In fact, Bond's early indication of interest, in November 2012, contemplated a similar $2.00 CVR based on future asset performance. *Id.* at 23.

55.     It soon became clear, however, that the Board would not reach consensus with respect to the direction of the Company.  Indeed, the Proxy notes that in January 2013, the Board was practically deadlocked on proceeding on parallel tracks with Bond and the Sidhu/Choudhrie recapitalization plan, voting 5-4 against.  *Id.* at 24.  Thereafter, in February 2013, the $2.00 CVR was reconstituted as an amount to be held in escrow and "payable subject to the satisfaction of certain conditions."  Specifically, "the escrowed funds would be payable … following final resolution of all stockholder claims that are brought within one year following the closing of the merger, and would be reduced by the payment, if any to Bond Street of an amount necessary to cover any losses incurred in connection with such claims…." *Id.*

56.     The Definitive Proxy fails to give any explanation for the change in structure from a $2.00 CVR tied to asset performance to a $2.00 escrow tied to stockholder claims relating to the merger, including whether the $2.00 CVR related to asset performance was subsumed within or retracted from the final $3.00 offer.  Clearly, a CVR tied to asset performance has absolutely nothing to do with an escrowed amount to cover stockholder claims.  The Company failed to provide any disclosure on this material point.

57. The escrow issue, however, has been resolved since the filing of Plaintiff's litigation. While significant issues remain, the Company has removed all contingency consideration as demanded in Plaintiff's initial pleadings.

58. Nevertheless, the $5 per share merger consideration pales in comparison to the Company's reported book value per share for the most recent quarter, $16.96 book value per share and the $10.00 per share paid by many current Atlantic stockholders in the 2010 offering.

59. Indeed, on April 24, 2013, Sidhu and Choudrie wrote again to the Board regarding their continued belief that the $5.00 deal price was insufficient. The letter states as follows:

April 24, 2013

ATLANTIC COAST FINANCIAL CORPORATION
10151 Deerwood Park Boulevard
Building 200, Suite 100
Jacksonville, Florida 32256

Attention: Board of Directors

I am again writing this letter on behalf of myself and my fellow director and fellow ACFC stockholder Bhanu Choudhrie.

We note the amendment to the Bond Street agreement that eliminates the escrow terms and the contingent nature of 40% of the purchase price. We were pleased to see this contingency removed – as we have stated on a number of occasions, it was completely inappropriate and contrary to the interests of ACFC stockholders that we were shocked that you approved it in the first place.

While that change is a step in the right direction and addresses one of our concerns, it's only a small step and does not address our primary concern about the value being offered to ACFC stockholders. Even a $5 per share purchase price without a $2 holdback greatly undervalues ACFC. It represents only about one-third of the company's tangible book

24

value per share, which is well below the pricing of similar transactions in the company's peer group.  It does not adequately take into account the expected improved earnings resulting from the company's improving performance, especially its improving credit quality and the fact that the company is only a few quarters away from the negative carry of structured borrowings starting to abate.  And we continue to believe that the price is well below the value we think would result from implementing the recapitalization plan and other recommendations we have proposed and provided to you.

We remain opposed to the transaction at this price and reiterate our intention to vote against it if it is brought to a stockholder vote.  And as you are well aware, many ACFC stockholders invested at prices in excess of $5, so we believe that removing the contingency so as to provide a guaranteed $5 payment is not going to be sufficient to persuade a majority of ACFC stockholders to approve this proposal.

In your latest public statement, you emphasize how the Bond Street transaction allows ACFC stockholders to "capitalize immediately" on their investment without having to undertake the risk that you believe is attached to our proposed alternative.  But how are ACFC stockholders expected to make an informed decision about the $5 deal you are supporting and judge the merits of our alternative (and your decision to reject that alternative) unless they are given full and fair disclosure?  Your disclosures fail to provide any substance to support your reasons for rejecting our alternative.  You make conclusory statements about the regulatory and execution risks purportedly relating to our proposed alternative but provide no real support for those conclusions.  Your disclosures also fail to provide any details regarding the analyses and information our advisors have provided to you that would allow ACFC stockholders to assess our alternative and compare it to your proposal.  We again urge you to provide these types of disclosures to ACFC stockholders.

We also urge you to attempt to secure a higher price for ACFC's stockholders.  While we believe that our proposed alternative would result in greater value to ACFC stockholders over time, we understand that stockholders may prefer the alternative of cashing out now.  We think that a price of at least $8 per share would give ACFC stockholders a clear choice between cash now and increased value over time by continuing their investment with an independent, profitable ACFC.  But at the current price and on the current terms, we continue to believe that the Bond Street transaction is unfair to stockholders.

Sincerely,

/s/ Jay S. Sidhu

Jay S. Sidhu

60.     As such, the Proposed Acquisition will allow Bond to purchase Atlantic at an unfairly low price while availing itself of Atlantic's significant value and upside or long-term potential.

## PRECLUSIVE DEAL PROTECTION MECHANISMS

61.     The Merger Agreement contains certain provisions that unduly benefit Bond by making an alternative transaction either prohibitively expensive or otherwise impossible.  Here, for example, the Merger Agreement contains a termination fee provision that requires Atlantic to pay $650,000.00 to Bond if the Merger Agreement is terminated under certain circumstances.  For instance, under one scenario, Atlantic must pay this fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  This fee was equal to approximately 8.25% of the guaranteed $3 consideration payable to Atlantic stockholder and still amounts to 5% of the $5.00 consideration.

62.     In contrast, the Merger Agreement does not require Bond to pay a reciprocal termination fee to Atlantic under *any* circumstances.

63.     The Merger Agreement also contains a "no shop" provision that restricts Atlantic from considering alternative acquisition proposals by, *inter alia*, constraining Atlantic's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from soliciting any alternative proposal after a defined time period, but permits the Board to consider a "*bona fide Acquisition Proposal*" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

64.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide Bond information in order to match any

26

other offer, thus providing Bond access to the unsolicited bidder's financial information and giving Bond the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Bond.

## THE DEFINITIVE PROXY OMITS MATERIAL INFORMATION

65. On May 13, 2013, Atlantic filed the Definitive Proxy statement with the SEC. As set forth below in detail, the Definitive Proxy omits material information about the Proposed Acquisition that must be disclosed to Atlantic's shareholders to enable them to make a fully informed decision. This omitted information, if disclosed, would significantly alter the total mix of information available to them.

***The Definitive Proxy Fails to Provide Adequate Information Concerning
the Process That Led to the Proposed Acquisition***

66. The Definitive Proxy omits material information with respect to the process and events leading up to the execution of the Merger Agreement, including:

    a.    Whether the confidentiality agreements entered into with 18 parties included standstill agreements and, if so, if the terms of each standstill agreement were the same for each of the 18 parties. This information bears directly on the process undertaken by the Board and whether the Board obtained the maximum value for shareholders is material. The omission of this information that could demonstrate that the parties who signed confidentiality agreements are contractually prohibited from making a superior offer for the Company renders the statement that the "Board of Directors determined that the proposed merger with Bond Street presented the best opportunity for enhancing stockholder value" misleading.

    b.    The criteria used by KBW beginning in December 2011 to determine which parties had a "reasonable likelihood of receiving regulatory approval to complete a transaction." This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process. The omission of this information pertaining to party selection renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

c.      The reasons provided by Party C in January 2012 that it was no longer interested in continuing the process.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process. The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

d.      The specifics of the "alternative transaction structure" KBW discussed with Party B and "three other potential candidates" in March 2012 and the identity of the "three other potential candidates."  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process. The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

e.      The reasons provided by Party B in April 2012 that it was no longer interested in the process.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

f.      The specific terms of the up to $2.00 CVR negotiated with Party D in and around June 2012, including the specific assets that would be subject to the CVR.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

g.      The reasons the Company entered into a 60 day exclusivity agreement with Party D in June 2012 and the reasons provided by Party D on June 27, 2012 for not continuing with the process.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process. The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

h.      The specific difficulties of "securing the standby investors necessary to complete a rights offering" discussed by the Board in August 2012.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

i.      The specific concerns raised by Board members at the October 2012 Board meeting regarding the ability of the recapitalization in the form of a rights offering to raise enough capital and the specific reasons why certain Board members did not believe it would receive regulatory approval.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.   The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

j.      The specific terms of the up to $2.00 CVR negotiated with Bond in and around November 2012, including the specific assets that would be subject to the CVR. This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

k.      Regarding the November 2012 Board meeting - the number of Board members, and identity of same, that constituted the "majority" expressing concern that the recapitalization proposal had "too much execution risk" and what concerns that majority had with respect to a "timely" approval by regulators.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

l.      Regarding the November 2012 Board meeting - the result of Atlantic's legal counsel seeking input from the regulators as to the feasibility of receiving regulatory approval for proposed standby investors in a rights offering.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process. The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

m.      Regarding the December 17, 2012 Board meeting – (i) what were the concerns raised by Board members regarding the "viability of the CVR," and (ii) what was the uncertainty raised by KBW with respect to Bond agreeing to a 60-90 day delay.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "the proposed merger is in the best interests of Atlantic Coast Financial and its stockholders" misleading.

n.      The names of the four board members who voted at the January 28, 2013 Board meeting to pursue both the Bond proposal and the rights offering recapitalization plan. This information bears directly on the process undertaken by the Board and

KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "Board of Directors determined that the proposed merger with Bond Street presented the best opportunity for enhancing stockholder value" misleading.

o.      Regarding Bond's February 2013 revision of consideration -  the Proxy fails to give any explanation for the change in structure from a $2.00 CVR tied to asset performance to a $2.00 escrow tied to stockholder claims relating to the merger, including whether the $2.00 CVR related to asset performance was subsumed within or retracted from the final $3.00 offer.  This information bears directly on the process undertaken by the Board and KBW and whether it was a full and fair process.  The omission of this information renders the statement that the "Board of Directors determined that the proposed merger with Bond Street presented the best opportunity for enhancing stockholder value" misleading.

***The Definitive Proxy Fails to Provide Adequate Information***
***Concerning the Company's Financial Advisor***

67.     The Company's financial advisor, KBW, was retained to render an opinion that the merger price is fair to the shareholders, and to perform the valuation analysis necessary to support that opinion.   In light of the materiality of this opinion and analysis to the market and Atlantic's shareholders, it is critical to know any facts that might suggest that the financial advisors are conflicted.  The Proxy is false and misleading for failing to disclose:

a.      details about any work KBW (or Stifel Nicolas) has done for Bond in the last two years.  This information which bears directly on the process undertaken by the Board and KBW's or Stifel Nicolas's potential conflicts of interest is material.  The omission of this information regarding potential conflicts of interest obtained renders all statements pertaining to the fairness of the Proposed Acquisition, as opined by KBW of Stifel Nicolas, misleading.

b.      what portion of KBW's fee is contingent upon the successful completion of the Merger.  This information which bears directly on the process undertaken by the Board and KBW's potential conflicts of interest is material.  The omission of this information regarding potential conflicts of interest obtained renders all

statements pertaining to the fairness of the Proposed Acquisition, as opined by KBW, misleading.

***The Definitive Proxy Fails to Disclose Sufficient Details***
***Concerning KBW's Fairness Opinion***

68.     In the Definitive Proxy, KBW describes its fairness opinion and the various valuation analyses it performed to render its opinion.  However, KBW's description fails to disclose necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion:

   ***Selected Public Companies Analysis*** (Proxy at 28-30)

1.     The individually observed metrics and multiples for each of the selected companies, including:
   a.     Return on average assets
   b.     Core return on average assets
   c.     Return on average equity
   d.     Core return on average equity
   e.     Net interest margin
   f.     Fee income/operating revenue ratio
   g.     Efficiency ratio
   h.     Tangible common equity/tangible assets
   i.     Total capital ratio
   j.     Loans/deposits
   k.     Loan loss reserve/loans
   l.     Nonperforming assets/assets
   m.     Net charge-offs/average loans
   n.     Stock price/book value per share
   o.     Stock price/tangible book value per share
   p.     Dividend yield
   q.     LTM dividend payout ratio

2.     Whether any other metrics or multiples were observed for the comparable companies, other than those currently listed in the Proxy.  If so, what were those additional individually observed metrics and multiples?

31

3.     The source of the financial data used by KBW for the comparable companies, as it appears that Community Bank of South Florida and Georgia Bancshares have never filed financial results with the SEC, and Community First Bancorporation and Southeastern Banking Corporation have no financial results filed with the SEC since the first quarter of 2012).

4.     This information which formed the basis for KBW's various analyses is material to shareholders.  Without an understanding of the underlying inputs and objective criteria used by KBW in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analysis, thereby rendering all statements pertaining to the analysis misleading.

***Selected Transactions Analysis*** (Proxy at 30-31)

1.     The individually observed metrics and multiples for each of the selected transactions, including:

     a.     Transaction price/tangible book value
     b.     Transaction price/core deposit premium
     c.     Transaction price/market premium

2.     Whether KBW observed additional metrics and multiples for the transactions, other than those currently listed in the Definitive Proxy, as it had for the Selected Companies Analysis.  If so, what were those individually observed metrics and multiples.

3.     This information which formed the basis for KBW's various analyses is material to shareholders.  Without an understanding of the underlying inputs and objective criteria used by KBW in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analysis, thereby rendering all statements pertaining to the analysis misleading.

***Discounted Cash Flow Analysis*** (Proxy at 31)

1.     How KBW determined the terminal earnings multiple of 12.0x – 16.0x.

2.     Whether any adjustment was made for non-cash items in calculating dividendable cash flow for this analysis.

3.      What were the specific inputs and assumptions used to determine the discount rate range of 15.0%-19.0%.

4.      The implied perpetuity growth rates observed from this analysis.

5.      How, if at all, KBW accounted for the value of NOLs as part of its analysis.

6.      This information which formed the basis for KBW's various analyses is material to shareholders.  Without an understanding of the underlying inputs and objective criteria used by KBW in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analysis, thereby rendering all statements pertaining to the analysis misleading.

***The Definitive Proxy Fails to Disclose Certain Material Information
Concerning Atlantic's Financial Projections***

69.      The Definitive Proxy fails to disclose certain material financial information concerning Atlantic.   In particular, the Definitive Proxy fails to disclose the financial projections provided by Atlantic and relied upon by KBW for purposes of its analyses, for fiscal years 2013-2018, for all line items provided.

70.      Information regarding the projections of Atlantic is material to shareholders given the change of control taking place in the transaction.  Additionally, this information which formed the basis for KBW's various analyses is material to shareholders.  Without an understanding of the underlying inputs and objective criteria used by KBW in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analysis, thereby rendering all statements pertaining to the analysis misleading

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

71.      In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's

assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's shareholders, including the duty to obtain maximum value under the circumstances.   To diligently comply with these duties, the directors may not take any action that:

      (a)      adversely affects the value provided to the corporation's shareholders;

      (b)      will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

      (c)      contractually prohibits them from complying with their fiduciary duties; and/or

      (d)      will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public shareholders, and place their own pecuniary interests above those of the interests of the company and its shareholders.

72.      In accordance with their duty of candor and duty to maximize shareholder value, the Individual Defendants, as directors and/or officers of Atlantic, are obligated to refrain from:

      (a)      participating in any transaction where the directors' or officers' loyalties are divided;

      (b)      participating in any transaction where the directors or officers are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

      (c)      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

73.      Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public shareholders of Atlantic, including their duty of candor and duty to maximize shareholder value.  As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Atlantic common stock in the Proposed Acquisition.

74.     As a result of these breaches of fiduciary duty, the Company's public shareholders will not receive adequate or fair value for their common stock in the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all holders of Atlantic common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

76.     This action is properly maintainable as a class action because, *inter alia*:

(a)     The Class is so numerous that joinder of all members is impracticable.  Atlantic's stock is publicly traded on the NasdaqGM and Plaintiff believes that there are hundreds if not thousands of holders of such shares.  Moreover, the holders of these shares are geographically dispersed throughout the United States;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  These common questions include, *inter alia*: (i) whether the Individual Defendants have engaged in self-dealing, to the detriment of Atlantic's public shareholders; (ii) whether the Proposed Acquisition is unfair to the Class, in that the price is inadequate and is not the fair value that could be obtained under the circumstances; (iii) whether Bond aided and abetted the Individual Defendants' breaches of fiduciary duty; and (iv) whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by Defendants;

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct

for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e) Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST COUNT

## CLAIM FOR BREACHES OF FIDUCIARY DUTIES BROUGHT DIRECTLY ON BEHALF OF PLAINTIFF AND THE CLASS

### (Against the Individual Defendants)

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     As alleged herein, Defendants have initiated a process to sell Atlantic that undervalues the Company.  In addition, Defendants failed to sufficiently inform themselves of Atlantic's value, or disregarded the true value of the Company, in an effort to benefit themselves.   Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and board that is committed to the Proposed Acquisition.

79.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value and the disclosure of material information.

80.     Plaintiff and the members of the Class have no adequate remedy at law.

## SECOND COUNT

## CLAIM FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES BROUGHT DIRECTLY ON BEHALF OF PLAINTIFF AND THE CLASS

### (Against Defendants Bond, Atlantic, and Florida Community Bank)

81.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

36

82.     Defendants Bond, Atlantic and Florida Community Bank knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.   In connection with discussions regarding the Proposed Acquisition, Bond and Florida Community Bank obtained sensitive non-public information from Atlantic concerning Atlantic's operations and thus had the advantage to acquire the Company at an unfair price.

83.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

84.     Plaintiff and the members of the Class have no adequate remedy at law.

## THIRD COUNT

## VIOLATIONS OF RULE 14(A) PROMULGATED UNDER THE SECURITIES EXCHANGE ACT OF 1934 BROUGHT INDIVIDUALLY

### (Against Individual Defendants and the Company)

85.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

86.     Plaintiff brings this claim individually and not on behalf of the class.

87.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

88.     During the Relevant Period, Defendants disseminated the false and misleading Definitive Proxy specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   Moreover, in the

exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

89.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Acquisition.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class, and against the Individual Defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representatives and certifying his counsel as class counsel;

B.     Declaring that shareholders should not be asked to vote on the Proposed Acquisition, and that such vote should be enjoined;

C.     Declaring that the Individual Defendants and each of them have committed a gross abuse of trust and have breached their fiduciary duties owed to Plaintiff and the Class and/or have aided and abetted such breaches;

D.     Declaring that the Proposed Acquisition was entered into in breach of the Individual Defendants' fiduciary duties and was therefore unlawful and unenforceable, and that the Proposed Acquisition or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition should be rescinded and invalidated;

E.     Declaring that the Proposed Acquisition, the Merger Agreement and/or the transactions contemplated thereby, should be rescinded and the parties restored to their original position;

F.     Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits,

property or value improperly received by Defendants and/or traceable thereto and/or in the possession of any of the Defendants as a result of their wrongful conduct;

      G.     Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from soliciting shareholder votes to consummate the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

      H.     Rescinding, to the extent already implemented, the Proposed Acquisition or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

      I.     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

      J.     Awarding compensatory damages in favor of Plaintiff against all Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

      K.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

      L.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

DATED:  May 20, 2013                         **BROWER PIVEN**
                                               **A Professional Corporation**

                                             _____/s/  Yelena Trepetin_____
                                             Charles J. Piven (Md. Fed. Bar No. 00967)
                                             Email: piven@browerpiven.com
                                             Yelena Trepetin (Md. Fed. Bar No. 28706)
                                             Email: trepetin@browerpiven.com
                                             1925 Old Valley Road
                                             Stevenson, MD 21153
                                             Tel: (410) 332-0030
                                             Fax: (410) 685-1300

                                             _Counsel for Plaintiff_

                                             OF COUNSEL:

                                             **BRODSKY & SMITH, LLC**
                                             Evan J. Smith
                                             Marc Ackerman
                                             Two Bala Plaza, Suite 602
                                             Bala Cynwyd, PA 19004
                                             T: (610) 667-6200

                                             **LEVI & KORSINSKY LLP**
                                             Donald J. Enright, Esq.
                                             1101 30th Street, NW, Suite 115
                                             Washington, DC 20007
                                             Tel:    (202) 524-4290
                                             Fax:    (202) 333-2121